**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAR 27 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

SCOTT KOLLER; TIM FERGUSON; RUBY CORNEJO; JOHN LYSEK, individually, and on behalf of the general public and those similarly situated,

Plaintiffs - Appellants,

v.

MONSANTO COMPANY; BAYER CROPSCIENCE LP; THE SCOTTS COMPANY LLC,

Defendants - Appellees,

and

SEAMLESS CONTROL LLC,

Defendant.

No. 24-43

D.C. No.
3:22-cv-04260-MMC

MEMORANDUM*

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted March 7, 2025
Pasadena, California

---

* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Before: TALLMAN, CLIFTON, and CHRISTEN, Circuit Judges.

Scott Koller, Tim Ferguson, Ruby Cornejo, and John Lysek ("Plaintiffs") bring this putative class action against defendants Monsanto Company, its parent company, Bayer Cropscience LP (collectively "Monsanto"), and The Scotts Company LLC. [1] They seek relief for alleged economic injuries suffered from buying certain Monsanto weedkiller products sold in concentrated form under the brand name Roundup.

Plaintiffs allege that the products at issue contain glyphosate, that glyphosate is substantially certain to form N-Nitrosoglyphosate ("NNG"), that NNG is carcinogenic, and that the NNG is substantially certain to form to a quantity level that is dangerous and violates various identified regulations. Plaintiffs allege that, as a result, they suffered economic injuries. They contend that their claims are different from the many personal injury actions that have been brought concerning Roundup products because this complaint seeks recovery only for economic injuries allegedly suffered at the time of purchase, regardless of whether Plaintiffs were physically harmed.

The district court granted Defendants' initial motions to dismiss the

---

[1] Plaintiffs also named Seamless Control LLC as a defendant. It is unclear whether Seamless remains to be treated as a defendant or appellee in this case. Defendants contend that Seamless was not served and no longer exists as a separate entity. Plaintiffs' reply brief appears to acknowledge that Seamless has merged into Monsanto. That is a question to be resolved by the district court on remand.

Plaintiffs' original Complaint and granted leave to amend. After Plaintiffs filed a First Amended Complaint ("FAC"), Defendants filed new motions to dismiss. The district court granted those motions, largely on grounds it cited in dismissing the original Complaint, and denied further leave to amend.

A dismissal for failure to state a claim under Rule 12(b)(6) is reviewed de novo. *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1105 (9th Cir. 2021). Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021). To survive dismissal, these facts must state a plausible claim to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

This pleading standard does not require us to conclude that the complaint states allegations that are probable. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id*. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

We affirm in part and reverse in part. We conclude that Plaintiffs alleged sufficient facts to plausibly state a claim for relief against Monsanto but also conclude that the claims against Scotts were properly dismissed without leave to amend.

*1. Monsanto*

The district court held that the FAC fell short of the plausibility requirement in alleging two propositions: (1) that NNG in an amount above 1 part per million (ppm) is carcinogenic and unsafe; and (2) that the products purchased by Plaintiffs have formed NNG above 1 ppm or that such transformation is substantially certain to occur. Plaintiffs dispute both holdings, and Defendants support both.

We conclude that the FAC contained sufficient allegations to make plausible the claim that NNG levels above 1 ppm pose a serious safety hazard. It is true that there are no applicable regulations that establish a firm 1 ppm limit for NNG. It is also true that the establishment of a 1 ppm limit for NNG in consumer products does not by itself establish that an NNG level above 1 ppm is necessarily carcinogenic or otherwise unsafe. The FAC alleged, though, that Monsanto's own corporate representative testified that Monsanto is not aware of any regulatory body in the world that allows more than 1 ppm of NNG in a glyphosate-based herbicide. It alleged that several identified statements by the EPA support the assertion that there should be concern for products containing NNG levels above 1 ppm. The FAC also explicitly referenced an expert declaration by Dr. Charles Jameson, a chemist and environmental toxicologist, which concluded, with some measure of scientific analysis and support, that NNG "poses a safety hazard to

24-43

customers at levels of 1 ppm or higher."[2]

To be clear, we do not hold that the submission of an expert opinion will always be enough to establish plausibility, but in this instance, when combined with other factual allegations, the FAC contains enough to make the relevant contention plausible. The facts alleged in the complaint remain to be proven, of course. We assume that, if the case continues, both Plaintiffs and Defendants will muster more robust evidence. At this point, however, we cannot conclude, on de novo review, that the facts alleged in the FAC were insufficient to get past the plausibility requirement at the pleading stage.

Similarly, we conclude that the FAC alleged enough at this stage of the case to make plausible the allegation that the level of NNG in the products purchased by Plaintiffs will exceed 1 ppm during the products' life. As Defendants fairly point out, the FAC did not allege facts to establish that any of the products actually purchased by any of the Plaintiffs, or to their knowledge by any other consumer, contained NNG above the 1 ppm level. But the FAC alleged other facts to support this contention, including that exposing glyphosate to nitrites could cause a chemical reaction that creates NNG, and that Monsanto employees acknowledged as much. The FAC alleged that containers of the products stored by consumer

___

[2] The district court struck that declaration from the FAC but did not strike the FAC allegations regarding Dr. Jameson's opinions. The district court drew that distinction explicitly in its order granting the motion to dismiss.

purchasers in garages posed risks of exposure to conditions, such as engine exhaust, humidity, and heat, which could promote the formation of NNG. Further, Plaintiffs alleged that Monsanto had discovered NNG at levels above 1 ppm in relevant products in its own possession, albeit in forms that might not closely resemble what was purchased by Plaintiffs.

Plaintiffs also alleged that the results of a 2004 study Monsanto conducted (the "2004 Study") supported its contention that the NNG level in the products would exceed 1 ppm following exposure to nitrogen dioxide, a compound found in vehicle emissions, among other places. After taking judicial notice of the 2004 Study, the district court appears primarily to have been persuaded to the contrary. The main thrust of the 2004 Study was to measure the formation of NNG when exposed to specified levels of nitrogen dioxide, a compound found in vehicle emissions, among other places, where they could be exposed to Roundup products stored by a consumer. The FAC alleged that the results of the 2004 Study supported its contention that the NNG level in the products would exceed 1 ppm. We are concerned that the copy of the study submitted by Monsanto to the district court did not include the Appendix to the report, as the missing portion was relevant to the discussion.[3]

---

[3] The parties and the court should be concerned about submission of and reliance upon an incomplete document. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1002 (9th Cir. 2018).

The district court determined that the 2004 Study did not supply sufficient support to Plaintiffs' claim. That determination appears to have been based on an understanding that "the study explains that the nitrites in the air cylinders were to be piped into the chambers containing the samples, which piping took six minutes to complete  . . . and that, once the chambers were filled with the nitrites, the samples were continuously exposed to them for either three days or six days." The Appendix was relevant because it detailed how long the product samples were exposed to nitrogen dioxide, including charts that suggested that the level of nitrogen dioxide pumped into the chambers dropped significantly after each six-minute exposure, undermining the impression that the exposure was continuous for three or six days. The district court was led astray because Monsanto submitted only a partial version of the 2004 study.

Again, if the case continues, the parties can be expected to develop and present more substantial evidence on the question. For now, based on our understanding of the study and the other allegations in the FAC, we conclude that the facts alleged in the FAC were sufficient to make plausible the contention that the level of NNG in the products purchased by Plaintiffs and other purchasers will exceed 1 ppm while the consumers possess the products.

Monsanto raises alternative grounds to support affirmation of the dismissal. Most of the alternative bases urged by Monsanto appear to us to rest upon the same

24-43

factual issues noted above, most importantly whether NNG levels in the products will exceed 1 ppm. The other arguments, presented at the end of Monsanto's answering brief, raise issues that were not relied upon or discussed by the district court. We decline to rely upon those arguments here and leave them to be developed and considered by the district court in the first instance.

*2. Scotts*

The district court did not reach the issue of whether the complaint stated plausible claims against Scotts because those claims were dismissed on the ground that the FAC did not allege sufficient facts to establish the plausibility of their key contentions. These arguments have been developed, however, in contrast to the alternative grounds urged by Monsanto which we declined to consider at this point. Under de novo review, we conclude that the record supports dismissal of all claims against Scotts.

Plaintiffs bring claims against Scotts under five causes of action. Most of those claims require the defendant to have some knowledge of wrongdoing. *See Graham v. Bank of Am., N.A.*, 172 Cal. Rptr. 3d 218, 228 (Cal. Ct. App. 2014); *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145 (9th Cir. 2012); *People v. Lynam*, 61 Cal. Rptr. 800, 806 (Cal. Ct. App. 1967). Plaintiffs fail to plead with sufficient particularity that Scotts had any knowledge that the products expired. Scotts' role in formulating the product does not demonstrate any factual basis for

the allegation that it knew that NNG could form above 1 ppm in the products. Neither does Scotts' action in informing consumers about the products' limited shelf life, as a shelf life is not the same as an expiration date.

Claims filed under California's Unfair Competition Law must be predicated on liability from personal participation in the unlawful practices and unbridled control over the conduct. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 808 (9th Cir. 2007). Plaintiffs fail to show Scotts had unbridled control over their allegedly unlawful practices because Plaintiffs never alleged that Scotts had any control over the registration of the products at all. Federal law also prohibits Scotts from changing the product labels to not conform with the registration. *See* U.S.C. § 136j(a)(1)(B); 40 C.F.R. § 168.22(a). Therefore, any claims arguing misbranding and advertising for unregistered products also fail.

Finally, Plaintiffs fail to sufficiently allege that Scotts is liable for Seamless Control. Scotts allegedly owned fifty-one percent of Seamless Control via a holding company. However, Plaintiffs do not plead any facts that pierce the corporate veil between the two companies. *See Mesler v. Bragg Mgmt. Co.*, 702 P.2d 601, 606 (Cal. 1985).

The FAC lacks sufficient allegations to support liability on behalf of Scotts. Plaintiffs have not identified any allegations that might rescue their complaint against Scotts from dismissal. Therefore, we affirm the dismissal of all claims

9                                                        24-43

against Scotts without leave to amend.

Accordingly, we reverse the district court's dismissal of claims against Monsanto Company and Bayer Cropscience LP. We affirm the district court's dismissal of claims against Scotts Company.[4]

**AFFIRMED in part; REVERSED in part; REMANDED for further proceedings.**

---

[4] We deny Defendants' Joint Motion for Judicial Notice. The decision to notice documents is discretionary. *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012). We decline to extend the pool of documents to be considered in order to evaluate the plausibility of Plaintiffs' allegations beyond those already recognized and considered by the district court. The district court declined to take notice of most of the documents submitted to us, and Defendants have not appealed that decision. As our court noted in *Khoja*, expanding that pool through judicial notice "risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Khoja*, 899 F.3d at 998. A motion to dismiss is not a motion for summary judgment.

24-43